**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**1:16-cv-77-FDW**

| | |
|---|---|
| **LEVON TODD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| | )     **ORDER** |
| | ) |
| **SUSAN WHITE, et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) |

    **THIS MATTER** comes before the Court on a Motion for Summary Judgment by Defendants Danny Grant, Cody Wiseman, Perry Frank, David Hoilman, Norma Melton, Mike Slagle, Aaron Smith, and Susan White.[1] (Doc. No. 37).

    **I.**    **BACKGROUND**

    **A.**    **Procedural Background**

    Plaintiff Levon Todd is a former North Carolina inmate. Plaintiff filed his original Complaint on March 24, 2016, naming as Defendants numerous former and current employees of Mountain View Correction Institution in Spruce Pine, North Carolina, where Plaintiff was

---

[1] Plaintiff also named as Defendants Mountain View correctional officer FNU Benefield, Mountain View correctional officer FNU Huggins, and various "John Does." Plaintiff never returned a summons for Defendant Benefield for service on him. Furthermore, the various John Does were never identified. Finally, the U.S. Marshal returned the service of summons for Defendant Huggins as unexecuted. (Doc. No. 22). In any event, the summary judgment ruling as to the moving Defendants on the merits also applies to Defendant Huggins, as he was one of the correctional officers alleged to have refused to allow Plaintiff to eat at the dining hall, and he is alleged to have refused to allow Plaintiff to eat at the dining hall on one occasion. (Doc. No. 13 at 5).

previously incarcerated after being convicted of being a habitual felon.  The North Carolina Department of Public Safety website shows that Plaintiff was released from prison on October 19, 2018.

Plaintiff filed Amended Complaints on May 23, 2016, and September 9, 2016.  (Doc. Nos. 9, 13).  Plaintiff named in his second Amended Complaint the following persons as Defendants, all of whom were employees of Mountain View Correctional Institution at all relevant times: (1) Danny Grant, Correctional Officer; (2) Perry Frank, Correctional Officer; (3) Cody Wiseman, Correctional Officer; (4) David Hoilman, Correctional Officer; (5) Susan White, Correctional Administrator; (6) Mike Slagle, Correctional Administrator; (7) Norma Melton, Nurse Supervisor; (8) Aaron Smith, Correctional Officer; (9) FNU Benefield, Correctional Officer; (10) FNU Huggins, Correctional Officer; and (11) various "John Does," who are alleged to be "transportation" correctional officers.   In his second Amended Complaint, Plaintiff alleges that, while he was incarcerated at Mountain View, Defendants used excessive force and cruel and unusual punishment against him, retaliated against him for his religious beliefs by not allowing him to eat at various times in the dining hall, and acted with deliberate indifference to his serious medical needs.   (Doc. No. 13).

Defendants filed the pending summary judgment motion on August 24, 2018.  On August 28, 2018, this Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the motion for summary judgment and of the manner in which evidence could be submitted to the Court.  (Doc. No. 39).  Plaintiff has not responded to the summary judgment motion, and the time to do so has

passed.[2]  Thus, this matter is ripe for disposition.

**B.  Factual Background**

**1.  The Summary Judgment Evidence**

**a.  Plaintiff's Allegations**

Plaintiff alleges in his Amended Complaint that he is an insulin-dependent type-2 diabetic.  (Doc. No. 13 at 4).  He also alleges that he is a practicing Muslim, and he contends that for a year before filing this action he "has been in contention with the administration and specifically Defendant White concerning [his] efforts to practice his Islamic faith at Mountain View."  (Doc. No. 13 at 4).  He alleges that White told him during one conversation that he would face a "hard and bumpy road" if he continued to try to practice his Islamic faith in the prison.  (Id. at 4).

Plaintiff alleges that, not long after the conversation he had with White, Defendants started refusing to allow Plaintiff to eat meals at the prison.  (Id.).  Plaintiff alleges that he receives insulin before every meal, but that:

> Defendants Grant, Frank, Hoilman, Benefield, and Wiseman limited the Plaintiff's time to eat to one minute or denied him the chance to eat at all.  This took place over two dozen times.  The Plaintiff has heard himself called a "terrorist" and a "Muslim" numerous times by the Defendants as he was leaving the dining hall without eating.

(Id. at 5).

Plaintiff also alleges that Defendant Nurse Melton was deliberately indifferent to Plaintiff's serious medical needs on March 25 and March 26, 2014.   Plaintiff alleges that, on

---

[2]   Because Plaintiff did not file a response to the summary judgment motion, he is deemed to have abandoned his claims.  See Crosby v. Gastonia, 635 F.3d 634, 637 n.3 (4th Cir. 2011).  In an abundance of caution, however, the Court will address the merits of Plaintiff's claims.

these two dates, "while taking his daily insulin shots, Plaintiff complained to Defendant Melton specially about excruciating headaches, blurred vision, loss of balance, numbness and tingling of limbs . . . to no avail." (Id.). Plaintiff filed a sick-call request the following day, and he was examined and taken to Spruce Pines Hospital on March 27, 2014, where he alleges that doctors discovered he had suffered from a "massive stroke." (Id.). Plaintiff alleges that he was transported by ambulance to Grace Hospital in Morganton, North Carolina, where he stayed for four days, and he was then transported to Central Prison.

Plaintiff also alleges that Defendant Aaron Smith used excessive force and cruel and unusual punishment when, as part of Plaintiff's medical transport to Spruce Pines Hospital, Plaintiff was placed in full restraints per NCDPS policy and the handcuffs were too tight, "resulting in swelling and discoloration in the Plaintiff's hands." (Id. at 6).

Finally, Plaintiff alleges that, during his transport from Grace Hospital to Central Prison, various unnamed John Doe officers "fully restrained" Plaintiff and, rather than using a wheelchair for Plaintiff, "dragged" him "from [the] transport vehicle to Central Prison and also from Grace Hospital to the transportation vehicle." (Id.). Plaintiff alleges that, after treatment for his stroke, he was transferred to Central Prison, where he remained in the hospital for three months, and he was then returned to Mountain View. (Id. at 6-7). Plaintiff alleges that he was then transferred to Alexander Correctional Institution for physical therapy for five months, during which time he "suffered serious complications due to stroke and diabetes combined." (Id. at 7). Plaintiff alleges that when he was returned to Mountain View he was "now in a wheelchair, speech impaired and sight impaired." (Id.). Plaintiff alleges that, upon his return to Mountain View, a doctor there told him he did not specialize in stroke patients. (Id.). According to Plaintiff, Defendant Melton became "irate, stating 'there is nothing else that can be done for

4

him.  We will not be now or later transferring him.'"  (Id.).  Plaintiff alleges that he was assigned to a "health assistant," but that he needs "therapeutic recreation," which is not available at Mountain View.  (Id.).  Plaintiff alleges that while at Mountain View, he "has not seen a stroke specialist, a speech therapist, nor has he been transferred to a medical facility."  (Id.).

Based on the above allegations, Plaintiff brings the following claims against the various Defendants: a violation of his equal protection and due process rights under the Fifth and Fourteenth Amendments; and a violation of his Eighth Amendment rights based on cruel and unusual punishment and deliberate indifference to serious medical needs.

**b.**     **Defendants' Summary Judgment Materials**

In support of the summary judgment motion, Defendants have submitted the affidavits of Danny Grant, Perry Frank, David Hoilman, Cody Wiseman, Susan White, Mike Slagle, Norma Melton, and Aaron Smith, along with attachments.  (Doc. Nos. 38-1 thru 38-8).  Defendants have also submitted two grievances filed by Plaintiff.  See (Doc. Nos. 38-9, 38-10).

First, as to Plaintiff's claim of deliberate indifference to serious medical needs, Defendants' summary judgment materials show that Nurse Jaime Grindstaff evaluated Plaintiff on March 24, 2014, for his chronic health conditions, including hypertension and diabetes.  See (Doc. No. 38-7: Melton Aff., Ex. A).  Defendants assert that, on that date, Plaintiff did not complain about headaches, blurred vision, loss of balance, numbness, or tingling of limbs.  See (Id. at ¶ 7).  Furthermore, Grindstaff's medical notes do not include any such complaints from Plaintiff during the March 24 examination.  Rather, the notes provide that Plaintiff reported only that some medicine he was taking was causing occasional rashes and nausea and that he sometimes has edema in his lower extremities.  (Id. at p. 6).  Plaintiff further indicated to Grindstaff that he had stopped exercising and eating his special diet, and that he had resumed

eating meals from the canteen. (<u>Id.</u>). He was encouraged to resume daily exercise and avoid canteen items. (<u>Id.</u>).

Defendants' evidence shows that the following day, March 25, 2014, Plaintiff filled out a sick-call appointment request form, complaining for the first time about "possible stroke complications." <u>See</u> (<u>Id.</u> at p. 8: Ex. B). A nurse triaged the sick call within 24 hours, on March 26, 2017, and Nurse Penny Weatherman evaluated Plaintiff the following day, March 27, 2014. (<u>Id.</u> at 2). At his sick-call appointment on March 27, 2014, Plaintiff complained for the first time about left-eye blurred vision, left-sided facial numbness/tingling, pain on the left side of his head, and dizziness when walking. <u>See</u> (<u>Id.</u> at ¶ 8). Nurse Weatherman also noted a slight drop to Plaintiff's left eye and left side of his mouth. (<u>Id.</u>). Based on Plaintiff's subjective complaints on March 27, 2014, as well as his presentation during the sick-call appointment with Nurse Weatherman, medical staff sent Plaintiff to Blue Ridge Hospital for further evaluation and treatment. (<u>Id.</u> at ¶ 9). Plaintiff was transported later that evening to Grace Hospital for further inpatient evaluation and treatment of possible stroke symptoms. (<u>Id.</u>).

Defendant Melton states that she does not recall Plaintiff complaining to her, between March 25 and 26, about any medical issues he was experiencing, including headaches, blurred vision, loss of balance, numbness, or tingling of limbs, nor did Plaintiff declare a medical emergency on those dates. <u>See</u> (<u>Id.</u> at ¶¶ 10, 11). Defendant Melton asserts that she did not evaluate or treat Plaintiff on March 25 or 26, aside from administering his daily insulin shots, and she further states that no one on the medical staff communicated to her that Plaintiff was experiencing any medical issues. (<u>Id.</u> at ¶¶ 10, 12).

Next, as to Plaintiff's remaining claims, including his claim related to treatment based on the fact that he was a practicing Muslim, including his allegation that some of the Defendants

refused to allow him to eat at times in the dining hall, Defendants contend on summary judgment that they did not refuse to allow Plaintiff eat at the dining hall, except on certain occasions when he showed up late, and they deny ever calling him a terrorist or a Muslim.  Specifically, Defendants Grant and Hoilman deny refusing Plaintiff's access to the dining hall or meals for any reason, including Plaintiff's religion.  See (Doc. No. 38-1 at ¶ 15: Grant Aff.; Doc. No. 38-3 at ¶ 15: Hoilman Aff.).  Defendants Frank and Wiseman attest that, on a single occasion on October 10, 2014, Plaintiff was not allowed to enter the dining hall because he was 20 minutes late, which violated NCDPS policy and it was too late for Plaintiff to be served.  See (Doc. No. 38-2 at ¶ 15: Frank Aff.; Doc. No. 38-4 at ¶ 15: Wiseman Aff.).  According to Defendants' evidence, therefore, Plaintiff was only denied access to the dining hall and "his right to eat" on one occasion because he violated NCDPS and was late to the dining hall.

As for Plaintiff's allegations of excessive force against Defendant Smith, Smith asserts in his sworn affidavit that when Plaintiff complained about his handcuffs being too tight, Smith asked another officer to loosen the cuffs, which she immediately did.  Specifically, Defendant Smith states that, as a correctional officer, he was not issued a handcuff key to loosen the cuffs. (Doc. No. 38-8 at ¶ 13: Smith Aff.).  Defendant Smith asserts that Correctional Sergeant Dale was also present, and Defendant Smith asked her if she could loosen Plaintiff's handcuffs.  (Id.). Dale immediately loosened Plaintiff's handcuffs.  Defendant Smith asserts that he saw no swelling or discoloration of Plaintiff's wrists, hands, or fingers.  See (Id. at ¶¶ 13, 14).

## II.       STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When determining whether a genuine issue has been raised, the court must construe all

inferences and ambiguities against the movant and in favor of the non-moving party. United

States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is

no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the

movant has made this threshold demonstration, the non-moving party, to survive the motion for

summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324. Rather,

the non-moving party must demonstrate specific, material facts exist that give rise to a genuine

issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the

non-movant's position is insufficient to withstand the summary judgment motion. Anderson,

477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to

preclude granting the summary judgment motion. Dash v. Mayweather, 731 F.3d 303, 311 (4th

Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment. Factual disputes that are

irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. Further, Rule 56

provides, in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by:
> (A) citing to particular parts of materials in the record, including depositions,
> documents, electronically stored information, affidavits or declarations,
> stipulations (including those made for purposes of the motion only), admissions,
> interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a
> genuine dispute, or that an adverse party cannot produce admissible evidence to
> support the fact.

FED. R. CIV. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the

non-movant, the non-movant must show the existence of a factual dispute on every essential element of his claim.

## III. DISCUSSION

### A. Plaintiff's Claims against Defendants in their Official Capacities

First, to the extent that Plaintiff has sued Defendants in their official capacities, a suit against a state official in his official capacity is construed as against the state itself.  Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).  It is well settled that neither a state nor its officials acting in their official capacities are "persons" subject to suit under 42 U.S.C. § 1983.  Id.; see Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 n.55 (1978).

Moreover, the Eleventh Amendment generally bars lawsuits by citizens against non-consenting states brought either in state or federal courts.  See Alden v. Maine, 527 U.S. 706, 712-13 (1999); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996).  Although Congress may abrogate the states' sovereign immunity, it has not chosen to do so for claims under 42 U.S.C. § 1983.  See Quern v. Jordan, 440 U.S. 332, 343 (1979).  North Carolina has not waived its sovereign immunity by consenting to be sued in federal court for claims brought under 42 U.S.C. § 1983.  See generally Mary's House, Inc. v. North Carolina, 976 F. Supp. 2d 691, 697 (M.D.N.C. 2013) (claim under 42 U.S.C. § 1983 barred by sovereign immunity of North Carolina which had not been waived).  Accordingly, Defendants are entitled to summary judgment as to Plaintiff's claims against him in their official capacities.

### B. Plaintiff's Claims Against Defendants in their Individual Capacities

### 1. Plaintiff's Claim of Deliberate Indifference to Serious Medical Needs

The Court first addresses Plaintiff's claim of deliberate indifference to serious medical

needs, in which Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs when, on March 25 and 26, 2014, he described various stroke symptoms to Nurse Melton, but she did nothing to have him medically treated. The Court first notes that the summary judgment evidence shows that none of the moving Defendants except for Nurse Melton was involved in or responsible for Plaintiff's medical care. Thus, the deliberate indifference claim applies only to Defendant Melton.

Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To state a claim under the Eighth Amendment, a plaintiff must show a "deliberate indifference to serious medical needs" of the inmate. Id. "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001) (citations omitted). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable Section 1983 claim. Estelle, 429 U.S. at 106; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."). To be found liable under the Eighth Amendment, a prison official must know of and consciously or intentionally disregard "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994);

Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), aff'd, 535 F.2d 1250 (4th Cir. 1976). The constitutional right is to medical care. No right exists to the type or scope of care desired by the individual prisoner. Id. at 763. Therefore, a disagreement "between an inmate and a physician over the inmate's proper medical care [does] not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (dismissing the plaintiff's § 1983 claim against a defendant physician for allegedly discharging the plaintiff too early from a medical clinic, as such claim did not rise to the level of deliberate indifference but would, "at most, constitute a claim of medical malpractice").

Here, Plaintiff has simply not raised a genuine issue of disputed fact as to whether Defendant Nurse Melton was deliberately indifferent to his serious medical needs. Indeed, the record evidence belies Plaintiff's argument that Defendant Melton prevented or delayed him from receiving medical treatment for his complaints. As noted, the record evidence, which Plaintiff has not rebutted, shows that Plaintiff received timely and appropriate medical evaluation and treatment for his stroke symptoms. Defendants have presented evidence showing that Nurse Grindstaff evaluated Plaintiff on March 24, 2014, and on that date he did not complain about any stroke symptoms. Plaintiff submitted a sick-call appointment request the next day, a nurse triaged the sick call request within 24 hours, and Plaintiff was seen for his sick-call appointment on March 27, 2014, after which he was immediately taken to an offsite hospital for further evaluation and treatment. Thus, contrary to Plaintiff's allegations, he was given prompt treatment for his complaints. In sum, the evidence on summary judgment shows that Defendant

Melton was not deliberately indifferent to Plaintiff's medical needs, and Plaintiff has not provided any evidence to create a genuine dispute of fact as to this issue. Thus, the Court grants Defendants' summary judgment motion as to Plaintiff's claim for deliberate indifference to serious medical needs.

### 2. Plaintiff's Claim of Cruel and Unusual Punishment Based on Defendants' Refusal to Allow Him to Eat in the Dining Hall on Various Occasions

Plaintiff next alleges that Defendants Grant, Wiseman, Frank, and Hoilman violated his constitutional rights by limiting "Plaintiff's time to eat to one minute or denied him the chance to eat at all." (Doc. No. 13 at 5). Plaintiff alleges that this "took place over two dozen times." (Id.). Plaintiff further alleges that these Defendants called him a "terrorist" and a "Muslim" numerous times as Plaintiff was leaving the dining hall.[3] (Id.).

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a section 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. In Porter v. Nussle, 534 U.S. 516 (2002), the Supreme Court held that the PLRA's exhaustion requirement applies to all inmate suits about prison life. The Court ruled that "exhaustion in cases covered by § 1997e(a) is now mandatory." Id. at 524 (citation omitted). The Porter Court

---

[3] Although Plaintiff does not state in his Complaint when these actions occurred, he did file a grievance against Defendants Wiseman and Frank regarding similar alleged incidents on October 10, 2015, and December 24, 2015. See (Doc. Nos. 38-9, 38-10: Grievance Nos. 4855-2015-864 and 4855-2015-CPOD-01286, attached as Defs. Exs. I and J). Plaintiff did not, however, file any similar grievances against Defendants Grant and Hoilman. (Id.).

stressed that, under the PLRA, exhaustion must take place before the commencement of the civil action in order to further the efficient administration of justice.  Id.

In Woodford v. Ngo, 548 U.S. 81 (2006), the Supreme Court held that the PLRA exhaustion requirement requires "proper" exhaustion:  "Administrative law . . . requir[es] proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'"  Id. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)).  In Jones v. Bock, 549 U.S. 199 (2007), the Supreme Court stated: "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."  Id. at 211 (citing Porter, 534 U.S. at 524).   Finally, it is well-settled that a prisoner may not exhaust his administrative remedies during the pendency of a Section 1983 action; rather, he must fully exhaust all steps of the administrative process before filing his lawsuit.  See Germain v. Shearin, 653 Fed. Appx. 231, 234 (4th Cir. 2016); French v. Warden, 442 F. App'x 845, 846 (4th Cir. 2011).

The NCDPS has a three-step administrative remedy procedure governing the filing of grievances.  See, e.g., Moore v. Bennette, 517 F.3d 717, 721 (4th Cir. 2008).  The NCDPS' Administrative Remedy Procedure ("ARP") first encourages inmates to attempt informal communication with responsible authorities at the facility where the problem arose.  If informal resolution is unsuccessful, the NCDPS ARP provides that any inmate in NCDPS custody may submit a written grievance on Form DC-410.  (Id.).  If the inmate is not satisfied with the decision reached at the step one level of the grievance process, he may request relief from the Facility Head.  If the inmate is not satisfied with the decision reached by the Facility Head, he may appeal his grievance to the Secretary of NCDPS through the inmate grievance examiner.  A decision by the Inmate Grievance Examiner ("IGE") or a modification by the Secretary of

NCDPS constitutes the final step of the Administrative Remedy Procedure.

The record demonstrates that Plaintiff did not file a grievance against Defendants Grant and Hoilman before filing his original Complaint on March 24, 2016. Plaintiff submitted Grievance Number 4855-2015-864 October 14, 2015, and Grievance Number 4855-2015-CPOD-01286 on December 24, 2015. See (Doc. Nos. 38-9, 38-10 : Exs. I & J). In those grievances, Plaintiff did not make any complaints against Defendants Grant and Hoilman. (Id.).

The claims against Defendants Grant and Hoilman must be dismissed because Plaintiff failed to allege any specific facts related to these Defendants; thus, he did not put them on fair notice of his claims against them. See Davidson v. Davis, 3:13-cv-590-FDW, 2015 WL 2696573, at *12 (W.D.N.C. Mar. 5, 2015) (noting that while an inmate is not required to name each defendant, but he is required to put "prison officials on fair notice that Plaintiff was complaining about . . .conduct" related to a specific officer); Moore, 517 F.3d at 729 (stating that the inmate's "pancreatic condition and Hepatitis C grievances, although alleging a pattern of inadequate medical care, did not give prison officials a fair opportunity to address the alleged inadequate care he received for his gout"). In sum, summary judgment will be granted to Defendants Grant and Hoilman because Plaintiff failed to exhaust his administrative remedies as to these two Defendants before filing this lawsuit.

In any event, Plaintiff's claim of cruel and unusual punishment is without merit as to all of the moving Defendants, as there is no genuine issue of disputed fact as to whether the moving Defendants subjected Plaintiff to cruel and unusual punishment in violation of his Eighth Amendment rights. To prove an Eighth Amendment violation based on conditions of confinement, a plaintiff must allege facts demonstrating the serious deprivation of a basic human need (the objective prong) and deliberate indifference to the jail conditions by the defendant (the

subjective prong).  Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993).  As for the objective

prong, "extreme deprivations" are required to make out a conditions-of-confinement claim.

Hudson v. McMillian, 503 U.S. 1, 8-9 (1992).  To show an extreme deprivation, a prisoner "must

produce evidence of a serious or significant physical or emotional injury resulting from the

challenged conditions," Strickler v. Waters, 989 F.2d at 1381, or demonstrate a substantial risk

of such serious harm resulting from the prisoner's unwilling exposure to the challenged

conditions, see Helling v. McKinney, 509 U.S. 25, 33-35 (1993).

 In support of his claim of cruel and unusual punishment, Plaintiff alleges that Defendants

Grant, Wiseman, Frank, and Hoilman "limited the Plaintiff's time to eat to one minute or denied

him the chance to eat at all."  (Doc. No. 13 at 5).  Plaintiff alleges that this occurred at least a

dozen times, on unspecified occasions.  Defendants Grant and Hoilman deny refusing Plaintiff's

access to the dining hall or meals for any reason, including Plaintiff's religion.  See (Doc. No.

38-1 at ¶ 15; Doc. No. 38-3 at ¶ 15).  Defendants Frank and Wiseman attest that on a single

occasion on October 10, 2014, Plaintiff was not allowed to enter the dining hall because he was

20 minutes late, which violated NCDPS policy and it was too late for Plaintiff to be served.  See

(Doc. No. 38-2 at ¶ 15; Doc. No. 38-4 at ¶ 15).  According to Defendants' evidence, therefore,

Plaintiff was only denied access to the dining hall and "his right to eat" on one occasion because

he violated NCDPS and was late to the dining hall.  Moving Defendants Grant, Wiseman, Frank,

and Hoilman also deny ever calling Plaintiff a "terrorist" or "Muslim."

 The Court will grant summary judgment to Defendants as to this claim.  Plaintiff did not

respond to the summary judgment motion, so he has not presented any evidence to dispute

Defendants' evidence, nor has he specified in his Amended Complaint when Defendants

allegedly refused to allow him to eat, or how he was harmed.  Finally, although Plaintiff makes

certain allegations regarding his Islamic faith, he does not allege that any of the moving

Defendants prevented or interfered with his ability to practice Islam.  As to Plaintiff's allegations

that moving Defendants called him a "terrorist," the Court condemns such statements if they

were made.  Nevertheless, verbal abuse of inmates by prison guards, without more, does not give

rise to a constitutional violation.  See Henslee v. Lewis, 153 Fed. Appx. 178, 180 (4th Cir. 2005).

In sum, summary judgment will be granted in favor of Defendants Grant, Wiseman, Frank, and

Hoilman as to Plaintiff's claim against them that his constitutional rights were violated because

these Defendants refused to allow him to eat at various times in the prison's dining hall.

**3.  Plaintiff's Claim of Excessive Force against Defendant Smith and Various John Doe Correctional Officers**

Plaintiff next contends that, while being transported from Mountain View to an outside

medical facility, Defendant Smith applied handcuffs too tightly, "resulting in swelling and

discoloration in the Plaintiff's hands."  (Doc. No. 13 at 6).  Plaintiff states that he told Defendant

Smith they were too tight, but that Smith refused to loosen them.  (Id.).

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S.

CONST. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of

pain," Whitley v. Albers, 475 U.S. 312, 319 (1986).  To establish an Eighth Amendment claim,

an inmate must satisfy both an objective component–that the harm inflicted was sufficiently

serious–and a subjective component–that the prison official acted with a sufficiently culpable

state of mind.  Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).  In adjudicating an

excessive force claim, the Court must consider such factors as the need for the use of force, the

relationship between that need and the amount of force used, the extent of the injury inflicted,

and, ultimately, whether the force was "applied in a good faith effort to maintain or restore

discipline, or maliciously and sadistically for the very purpose of causing harm." <u>Albers</u>, 475 U.S. at 320-21. Furthermore, although the lack of serious injury may be considered a factor in the excessive force analysis, the fact that the prisoner suffered only minor injuries is not dispositive in an excessive force claim. See <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 38 (2010).

Applying the <u>Whitley</u> factors to the summary judgment evidence, the Court finds that Defendant Smith is entitled to summary judgment. In response to Plaintiff's allegations, Defendant Smith states that, as a correctional officer, he was not issued a handcuff key to loosen the cuffs. (Doc. No. 38-8 at ¶ 13). Defendant Smith asserts that Correctional Sergeant Dale was also present, and Defendant Smith asked her if she could loosen Plaintiff's handcuffs. (<u>Id.</u>). Dale immediately loosened Plaintiff's handcuffs. Defendant Smith asserts that he saw no swelling or discoloration of Plaintiff's wrists, hands, or fingers. See (<u>Id.</u> at ¶¶ 13, 14).

At most, Plaintiff alleges that Defendant Smith placed the handcuffs on Plaintiff too tightly, causing temporary pain and some swelling. The undisputed evidence shows, however, that the handcuffs were loosened immediately after Plaintiff complained about them being too tight. Plaintiff has presented no evidence whatsoever that Defendant Smith's conduct was done with a malicious and sadistic intent to cause harm to Plaintiff. Furthermore, Plaintiff alleges that, at most, he suffered from temporary pain and swelling to his hand. Although minimal injury is not dispositive in an excessive force claim, the Court may consider it as a factor in assessing whether excessive force was used. See <u>Wilkins</u>, 559 U.S. at 38. Plaintiff has simply not presented any evidence to raise a genuine dispute as to whether Defendant Smith used excessive force against him. Thus, Defendant Smith is entitled to summary judgment as to this claim.

Finally, although Plaintiff did not serve or identify various John Doe Defendants in this action, he appears to also allege an excessive force claim against them based on his allegations

that he was placed in full restraints while being transported from prison to prison, and that he was "dragged" from place to place, rather than being allowed to use a wheelchair. Defendants have presented evidence on summary judgment showing that, while Defendant was incarcerated, he was convicted of committing numerous disciplinary infractions, including disobeying orders, profane language, contraband, selling/misusing medication, fighting with a weapon, interfering with staff, substance possession, provoking an assault, active rioting, and unauthorized leave. (Doc. No. 38-8 at 11). This Court defers to the prison's determination that Plaintiff was too dangerous to be allowed in a wheelchair during transport. Furthermore, despite that Plaintiff alleges that he was "dragged" during transport in full restraints, he does not allege that he suffered any injuries as a result of allegedly being dragged. In sum, the Court grants summary judgment to Defendants as to this claim.

### 4. Plaintiff's Claims against Defendants White and Slagle

Plaintiff has also named prison supervisors White and Slagle as Defendants. The Court first notes that, although Plaintiff seeks to impose individual liability against Defendants White and Slagle, his allegations against these two Defendants appear to be solely based on their supervisory status, rather than on any personal participation by these two Defendants in the alleged constitutional violations against him. The doctrine of respondeat superior is inapplicable to § 1983 claims. To establish supervisory liability under § 1983, a plaintiff must allege facts showing: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular

18

constitutional injury suffered by the plaintiff. Randall v. Prince George's County, Md., 302 F.3d 188, 206 (4th Cir. 2002) (quotations omitted).

Under the first prong, the subordinates' conduct must be "pervasive," "meaning that the conduct is widespread, or at least has been used on several different occasions." Id. Hence, a plaintiff will not satisfy the deliberate indifference standard "by pointing to a single incident or isolated incidents[.]" Id. Rather, at a minimum, the plaintiff must demonstrate that the supervisor exhibited "continued inaction in the face of documented widespread abuses." Id.

To the extent that Plaintiff is alleging supervisory liability with respect to Defendants White and Slagle, Plaintiff's claims fail. Plaintiff alleges that Defendants White and Slagle "are legally responsible for the operation of Mountain View Correctional and for the welfare of all the inmates in that prison." (Doc. No. 13 at 2). Plaintiff's conclusory allegations are insufficient to prove supervisory liability. Furthermore, while Plaintiff alleges that Defendant Susan White told Plaintiff it would be "a hard and bumpy road" if Plaintiff chose to practice Islam, Plaintiff does not make any specific constitutional allegations against Defendant White. Moreover, White denies ever having any specific conversations with Plaintiff regarding his Islamic faith, and she denies that she mistreated, retaliated, or discriminated against Plaintiff for any reason, including his religious preference. See (Doc. No. 38-5 at ¶ 15). Further, Defendants White and Slagle were not responsible personally for providing medical care to inmates at Mountain View. See (Doc. No. 38-5 at ¶ 5; Doc. No. 38-6 at ¶ 5). As to Defendant Slagle, Plaintiff vaguely asserts that he arranged for Plaintiff's medical transport by a state vehicle instead of in an ambulance. The record evidence shows, however, that Defendant Slagle was not involved in deciding how an inmate is transported to an outside medical appointment; rather, the medical department makes that decision. See (Doc. No. 38-6 at ¶ 15). Thus, Defendant Slagle was not involved in the

decision regarding how Plaintiff was transported to either Blue Ridge Regional Hospital or Grace Hospital on March 27, 2014.  See (Id. at ¶ 16).  In sum, the substantial evidence in the record shows that no reasonable juror could find that Defendants White or Slagle are liable under a theory of supervisor liability.  Thus, these Defendants are entitled to summary judgment.

### 5.    Plaintiff's Claims of Due Process and Equal Protection Violations Based on His Treatment While at Mountain View

In his final claim, Plaintiff alleges that the alleged conduct of Defendants essentially amounts to a violation of his Equal Protection rights.  For the following reasons, this Court disagrees.  In support of his claim, Plaintiff alleges that, of the 1000 inmates at Mountain View, less than 10 percent of them are African-American.  (Doc. No. 13 at 9-10).  He further alleges that only one correctional officer at Mountain View is African-American, and only ten inmates follow Islam.  Plaintiff alleges that his problems at Mountain View did not begin until after his alleged conversation with Defendant White, in which she told him that he would face a "hard and bumpy road" at Mountain View if he chose to practice Islam.  Plaintiff alleges that the combination of "preventing [him] from eating, retaliation for exercising the right to practice religion, the excessively tight hand restraints, etc." amounts to a violation of his Equal Protection rights as an African-American inmate who practices Islam.  (Id. at 10).

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  To survive summary judgment on an equal protection claim, "a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).  However, proof of

discriminatory intent is required to establish a violation of the Equal Protection Clause.  See

Shaw v. Martin, 733 F.2d 304 (4th Cir. 1984).  Here, even assuming that Plaintiff could show

that he is similarly situated with white, non-Muslim inmates and that he was treated differently

from them, he has not made the requisite showing that such disparate treatment was the result of

purposeful or intentional discrimination.  Rather, Plaintiff merely concludes from the alleged

disparate treatment that the intent was discriminatory, which is not enough to establish an equal

protection claim.  The Court will therefore grant summary judgment to Defendants as to

Plaintiff's equal protection claim.

## IV.    CONCLUSION

In sum, Defendants are entitled to summary judgment.[4]

**IT IS, THEREFORE, ORDERED** that:

1.   Defendants' Motion for Summary Judgment, (Doc. No. 37), is **GRANTED**.

2.  This action is dismissed with prejudice.

3.  The Clerk is directed to terminate this action.

Signed: January 3, 2019

Frank D. Whitney
Chief United States District Judge

---

[4]  Defendants also raised qualified immunity as a defense to Plaintiff's excessive force claim.
Because the Court has determined that there was no constitutional violation in the first instance,
the Court does not need to determine whether Defendants are entitled to qualified immunity.